Lauriat, J.
Plaintiff, Granada House, Inc. (“Granada House”) has moved, pursuant to Mass.R.Civ.P. 56, for summary judgment on Counts I, IV and VI of its Amended Verified Complaint against the defendants, City of Boston (“the City”), City of Boston Board of Appeal (“the Zoning Board”) and the members of the Board. The City has moved for summary judgment on Counts II and III of the Amended Verified Complaint.
For the following reasons, Granada House’s Motion for Partial Summary Judgment is ALLOWED as to Counts I, IV and VI. The City’s Motion for Summary Judgment as to Counts II and III is DENIED.
BACKGROUND
Granada House is a nonprofit corporation which, for at least fifteen years, has operated a supervised, six-month residential treatment program for men and women recovering from alcohol and drug addiction. It presently operates in an institutional setting in a leased facility on the grounds of the former Brighton Marine Hospital, now known as the Brighton Marine Public Health Center. Ex-alcoholics and ex-drug addicts voluntarily apply to the program and must be sober for at least 30 days prior to being admitted into the program. The residents of Granada House’s program participate in planned therapy sessions and group meetings, perform chores, share meals with one another and engage in other social activities in a home-like setting. The Massachusetts Department of Public Health has licensed Granada House to operate its program and has contracted with Granada House for its services.
*467 More than five years ago, Granada House decided that in order to further the goals of its program, it would seek to relocate to a permanent home in a residential neighborhood. On February 26,1996, after a long search for a suitable residence in several communities, Granada House found and entered into a purchase and sale agreement to acquire a two-family residence at 70-72 Adamson Street (“the Adamson Street property”) in the Allston section of Boston. The agreement conditioned the sale of the Adamson Street property on Granada House obtaining “all necessary state and local governmental approvals,” including approvals from the City’s Inspectional Services Department and a use variance from City’s Board of Appeal by April 25, 1996. The sellers have since extended that deadline to March 14, 1997, and have extended the closing date to March 28, 1997. If the approvals are obtained, and the transaction closes, Granada House plans to invest $236,500 to purchase the Adamson Street property and an additional $250,000 on renovations to the building and grounds.
PROCEDURAL BACKGROUND
On April 8, 1996, Granada House applied to the City’s Inspectional Services Department (“ISD”) for a change in the legal use of the Adamson Street property from its existing use as a two-family residence to a “Group Care Residence, General” for twenty-two recovering substance abusers. On May 13, 1996, the ISD denied the application on the grounds that Article 51, Section 8 of the Boston Zoning Code (“the Code”), prohibited “Group Care Residence, General” occupancy in the subdistrict of the Adamson Street Property, and that Article 51, Section 49(4)(a) of the Code prohibited the proposed off-street parking for the staff on the property.
OnMay21, 1996, Granada House appealed the ISD decision to the City of Boston Board of Appeal (“the Zoning Board”), requesting variances from the Code. On October 8, 1996, the Zoning Board held a public hearing and denied the requests for variances.
On December 2, 1996, Granada House filed the present action and sought a preliminary injunction against the City. After a hearing, the Court denied the request for injunctive relief on December 18, 1996. The court, however, ordered an expedited trial of this action, and set a trial date of February 20, 1997. By agreement of the parties, and in order to permit the filing and determination of the pending summary judgment motions, the trial was rescheduled for March 3, 1997.
On January 24, 1997, Granada House filed a second permit application with ISD, requesting a change in the legal occupancy of the Adamson Street property from a two-family residence to a “Group Residence, Limited.” The ISD denied this second permit application on February 10, 1997, on the ground that the proposed use of the Adamson Street property by the Granada House was as a forbidden “Group Care Residence, General,” rather than as an allowed “Group Residence, Limited.”
DISCUSSION
Summary judgment must be granted where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the moving party is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). With respect to any claim on which the party moving for summary judgment does not have the burden of proof at trial, it may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); accord, Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat a motion for summary judgment.” Pederson v. Time, Inc., 404 Mass. at 17. The opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment. LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
In ruling on a motion for summary judgment, the court must not consider the “credibility of the witnesses or the weight of the evidence, nor should the [court] make findings of fact.” Rilet v. Presnell, 409 Mass. 239, 244 (1991), citing Attorney General v. Bailey, 386 Mass. 367, 370 (1982). However, the movant is held to a stringent standard .. . [A]ny doubt as to the existence of a genuine issue of material fact will be resolved against the movant." 10A C. Wright, A.R. Miller & M. Kane, Federal Practice and Procedure, §2727, at 125-26 (1983) (construing Fed.R.Civ.R 56).
The City regulates the use of the Adamson Street property through the Code. Article 2A of the Code, which contains the definitions applicable to Neighborhood Districts, was enacted in 1993. Article 2Adefines “family” as:
One or more persons occupying a dwelling unit and living as a single, nonprofit housekeeping unit, provided that a group of five (5) or more persons who are not within the second degree of kinship shall not be deemed to constitute a family, except that a Group Residence, Limited, as defined in this Section 2A-1 shall be deemed a family.
Article 2A, Section 2A-1.
*468 Article 2A of the Code further establishes two use classifications for group homes. The first use, “Group Care Residence, General," is defined in the Code as:
Premises for the residential care or supervision (but not including custodial care) of ex-alcoholics, ex-drug addicts, pre-release or post-release convicts or juveniles under seventeen years of age who are under the care of correctional agencies of the Commonwealth, but not including premises licensed, regulated, or operated by the Commonwealth of Massachusetts or operated by a vendor under contract with the Commonwealth for the residential living, care, or supervision in any single dwelling unit of five or more mentally ill or mentally retarded persons or persons with disabilities. [Emphasis added.]
Article 2A, Section 2A-1. The second use, “Group Residence, Limited,” is defined in the Code as:
premises licensed, regulated or operated by the Commonwealth of Massachusetts or operated by a vendor under contract with the Commonwealth of Massachusetts or operated by a vendor under contract with the Commonwealth for the residential living, care, or supervision in any single dwelling unit of five or more mentally ill or mentally retarded persons or persons with disabilities.
Article 2A, Section 2A-1.
The Adamson Street property is located in a two-family residential subdistrict of the Allston-Brighton Neighborhood District. Article 51 of the Code, which contains the ordinances applicable to the AllstonBrighton Neighborhood District, allows a “Group Residence, Limited” in two-family residential subdistricts in Allston-Brighton. Article 51, Section 8, Table A. It also allows one-family dwellings and two-family detached dwellings, regardless of family size. Id. However, Article 51 of the Code expressly forbids a “Group Care Residence, General” in two-family residential subdistricts in Allston-Brighton. Id. The Code also forbids accessory parking in any part of the front or side yards in two-family residential subdistricts in Allston-Brighton. Article 51, §49(4)(a).
The definition of “Group Residence, Limited” in Article 2A of the Code is the same as the definition of “Group Residence, Limited” in Article 2, the general definitions section of the Code. The City of Boston Zoning Commission (“the Zoning Commission”) added the “Group Residence, Limited" classification to Article 2 of the Code in 1979. As originally enacted, the definition included “mentally ill, mentally retarded, or physically handicapped persons.” It did not include “persons with disabilities.”
In 1991, the Zoning Commission amended the “Group Residence, Limited” classification to bring the Code into compliance with the federal Fair Housing Act. 42 U.S.C. §3601 et seq. The 1991 amendment added the phrase “persons with disabilities” to the definition of “Group Residence, Limited” in Article 2 of the Code.
A. Count I: The Fair Housing Act
Count I of the Amended Verified Complaint alleges that in denying Granada House’s request for change in the legal use of the Adamson Street property, the City violated the federal Fair Housing Act (“FHA”). 42 U.S.C. §3601 etseq.
Congress enacted the FHA as Title VIII of the Civil Rights Act of 1968 to prohibit housing discrimination on the basis, inter alia, of race, gender, and national origin. Larkin v. State of Michigan Dept. of Social Services, 89 F.3d 285, 288 (6th Cir. 1996). In 1988, Congress expanded the coverage of the FHA by enacting the Fair Housing Act Amendments.
The FHA, as amended, makes it unlawful:
To discriminate in the sale or rental, or otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of. . .
(B) a person residing in or intending to reside in that dwelling after it is sold, rented, or made available.
42 U.S.C. §3604(f)(1)(B). As amended, the FHA applies to zoning ordinances and to the zoning of group homes. See Larkin, 89 F.3d at 289; Casa Marie, Inc. v. Superior Court of Puerto Rico, 988 F.2d 252, 257 n.6 (1st Cir. 1993).
Granada House's residents sire “handicapped” within the meaning of the FHA. The FHA provides, in pertinent part, that:
“Handicap” means, with respect to a person—
(1) a physical or mental impairment which substantially limits one or more of such person’s major life activities,
(2) a record of having such an impairment, or
(3) being regarded as having such an impairment, but such term does not include current, illegal use of or addiction to a controlled substance (as defined in Section 802 of Title 21).
42 U.S.C. §3602(h). Individuals recovering from alcohol and drug addiction, who no longer engage in the illegal use of drugs, are “handicapped” under the FHA. Oxford House, Inc. v. Town of Babylon, 819 F.Supp. 1179, 1182 (E.D.N.Y. 1993); accord U.S. v. Southern Management Corp., 955 F.2d 914, 921-23 (4th Cir. 1992).
i.
Zoning regulations should be interpreted to avoid illegality. See Farmer v. Billerica, 381 Mass. 775, 776 (1980); Doliner v. Town Clerk of Millis, 343 Mass. 10, 15 (1961). If Granada House is classified under the Code as a “Group Residence, Limited,” then it would also fall within the definition of “family” under the Code, and the Code would not violate the FHA. While the definition of “Group Care Residence, General” broadly includes all premises for the residential care *469 or supervision of ex-alcoholics or ex-drug addicts, irrespective of who may be providing that care, excluded from its ambit are premises licenced, regulated or operated “by a vendor under contract with the Commonwealth of Massachusetts for the residential living care, or supervision in any single dwelling unit of five or more . . . persons with disabilities.” Granada House is a vendor under contract with the Massachusetts Department of Public Health. Its contract is for the “residential living, care, or supervision in any single dwelling for five or more persons” who are recovering substance abusers. The FHA defines those individuals as “handicapped persons," and handicapped persons are “persons with disabilities.” Granada House, therefore qualifies for the exclusion authorized by the definition of “Group Care Residence, General.”
The only interpretation of the Code that is consistent with the “handicapped person” requirements of the FHA is therefore one that classifies the Granada House as a “Group Residence, Limited.” Otherwise, ex-alcohol and ex-drug addicts who participate in a state licenced and regulated group home are unfairly distinguished from other similarly situated “persons with disabilities" who fall within tibe ambit of “Group Residence, Limited.”
The City contends that Granada House has not exhausted all administrative remedies with respect to its claim that its operation should be classified as a “Group Residence, Limited.” Granada House reapplied to the IDS on January 24, 1997 for a permit to change the legal use of the Adamson Street property to a “Group Residence, Limited.” The ISD denied the application on February 10, 1997, concluding that the proposed use was in fact a “Group Care Residence, General” and therefore in violation of the Code provisions applicable to the Adamson Street subdistrict. Granada House has not yet appealed the ISD decision to the Zoning Board, and the time in which to do so has not yet run. However, Granada House asserts that in the circumstances of this case, it is not required to exhaust its administrative remedies before pursuing the present action.
Resort to the administrative process is generally a prerequisite to invoking the jurisdiction of a court. Stock v. Massachusetts Hospital School, 392 Mass. 205, 212-13 (1984). It is desirable both from the standpoint of the agency and from the standpoint of unnecessary burdens upon the court to allow an agency to police itself. Ludlum v. Resor, 507 F.2d 398, 400 (1974). The exhaustion requirement is grounded in substantial concerns not only of fairness and orderly procedure, . . . but also of competence. Bradley v. Weinberger, 483 F.2d 410, 415 (1973).
Exhaustion, however, is not required where, as here, it would prove futile, or where irreparable harm would result if judicial action were delayed by the implementation of the administrative process. Stock v. Massachusetts Hospital School, 392 Mass. 205, 213 (1984), and cases cited therein. Exhaustion is also unnecessary where the dispute involves a “pure matter of law,” or when constitutional issues have been raised. Shick v. Farmers Home Admin., 583 F.Supp. 534, 537 (1984). The ordinary requirements of exhaustion will be suspended when “the facts of a particular case raise important public questions whose resolution concerns or will affect more persons than the parties to the case.” East Chop Tennis Club v. Massachusetts Comm’n Against Discrimination, 364 Mass. 444, 450 (1973). In the present case, the court concludes that for all of the reasons set forth above, Granada House is not required to further exhaust its administrative remedies by awaiting the outcome of an appeal of the ISD decision of February 10, 1997 to the Zoning Board.
ii.
The City contends that Granada House should be classified as a “Group Care Residence, General” rather than a “Group Residence, Limited.” The court concludes as a matter of law that this classification violates the FHA because it discriminates against “handicapped persons.”
The use of zoning provisions to discriminate against handicapped persons is proscribed by the FHA. See State of Michigan Dept. of Social Services, 89 F.3d at 289-90; Epicenter of Stubenville v. City of Stubenville, 924 F.Supp. 845, 851 (S.D. Ohio 1996); Alliance for Mentally III v. City of Naperville, 923 F.Supp. 1057, 1069-71 (N.D.Ill. 1996); Ass’n for Advancement of the Mentally Handicapped, Inc. v. City of Elizabeth, 876 F.Supp. 614, 621 (D.N.J. 1994). Only where a discriminatory classification is “warranted by the unique and specific needs” of a particular handicapped group would the use of that classification be permissible. Larkin v. State of Michigan Dept. of Social Services, 89 F.3d at 290 (6th Cir. 1996); Bangerter v. Orem City Corp., 46 F.3d 1491, 1503-04 (10th Cir. 1995).
The Adamson Street property is located in a sub-district of Boston where the Code allows a “Group Residence, Limited” but expressly forbids a “Group Care Residence, General.”[1] Article 51, Section 8, Table A. The Code, therefore, forbids Granada House from operating at a location where it permits groups of mentally handicapped individuals, or persons with disabilities, from residing. These Code requirements have the effect of discriminating against handicapped people. The City has advanced no legitimate reason, individualized to recovering alcoholics or drug addicts, that would warrant or justify such discrimination. At best, it has offered speculative grounds, such as traffic, parking, and noise problems, or concerns that the residents of Granada House might be prone to criminal behavior, as a basis for its disparate treatment of Granada House. However, municipalities may not justify discriminatory zoning practices on the basis of “unfounded speculations” or “blatant stereotypes.” *470 See, e.g., Bangerter v. Orem City Corp., 46 F.3d at 1503 (10th Cir. 1995); Epicenter of Stubenville v. City of Stubenville, 924 F.Supp. at 851 (S.D. Ohio 1996).
Moreover, the City’s expressed concerns about Granada House’s use of the Adamson Street property do not justify or explain its allowance, without a variance, of the use of that facility by “five or more mentally ill or mentally retarded persons or persons with disabilities.” The record in this case does not support “any rational basis for believing that [a group home for recovering substance abusers] would pose any special threat to the City’s legitimate interests.” Cleberne v. Cleberne Living Center, Inc., 473 U.S. 432, 448 (1985). “Mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home [for recovering substance abusers] differently from [other group homes].” Id. In the circumstances of the present case, the City has advanced no substantial reasons for treating the residents of Granada House differently from those of a permitted group home for mentally ill, mentally retarded, or other persons with disabilities.
iii.
Even if the City’s classification of Granada House as a “Group Care Residence, General” under the Code could be deemed facially nondiscriminatory under the FHA, the court nevertheless concludes that the City has violated the FHA by failing to make “reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling.” 42 U.S.C. §3604(f)(3)(B); City of Edmonds v. Oxford House, Inc., 15 S.Ct. 1776, 1779 (1995).
The FHA’s reasonable accommodations requirement is clearly applicable to “zoning ordinances and other land use regulations and practices.” See Oxford House, Inc. v. Town of Babylon, 819 F.Supp. 1179, 1185 (E.D.N.Y. 1993), and cases cited therein. An accommodation is reasonable “if it does not cause any undue hardship or fiscal or administrative burdens on the municipality, or does not undermine the basic purpose that the zoning ordinance seeks to achieve.” Id. at 1186.
In this case, Granada House has requested that the City make two accommodations in its application of the Code to the Adamson Street property: that the City allow Granada House to locate its group home in a two-family residential subdistrict where other group homes are permitted, and that the City allow it to provide parking spaces in the front and side yard of the Adamson Street property for its staff. Granada House has demonstrated that as recovering alcoholics and drug addicts, its residents must live in a residential neighborhood, because it seeks to provide a stable, affordable, drug and alcohol-free living environment, so as to increase the likelihood that its residents will stay sober. The location of Granada House in a stable, residential neighborhood plays an important role in an individual’s recovery by “promoting self-esteem, [and] helping to create an incentive not to relapse." Oxford House, Inc. v. Township of Cherry Hill, 799 F.Supp. 450, 453 (D.N.J. 1992). Moreover, the location of Granada House in a residential neighborhood is encouraged and supported by the Massachusetts Department of Public Health, which licences, controls, and regulates the operation of Granada House.
This court concludes that the grounds articulated for Granada House’s requests for reasonable accommodations by the City under the Code are persuasive. Because Granada House, if classified as a “Group Care Residence, General” cannot exist in a residential two-family neighborhood under the Code, the accommodations it has requested are warranted so that it may have the same opportuniiy to use the Adamson Street property as would persons without handicaps, groups of persons who are mentally ill or mentally retarded or groups of other persons with disabilities.
In its opposition, the City has not shown how making reasonable accommodations to allow Granada House to use the Adamson Street property would cause “any undue hardship or fiscal or administrative burdens on the municipality.” Nor has it advanced any support for its assertion that allowing Granada House to use the Adamson Street property would “undermine the basic purpose that the zoning ordinance seeks to achieve,” given that the Code allows group homes for mentally ill, mentally retarded or other persons with disabilities.
Accordingly, Granada House is entitled to summary judgment on Count I of its Amended Verified Complaint.
B. Count IV; The Massachusetts Zoning Act
Count IV of the Amended Verified Complaint alleges that in denying Granada House’s request for change in the legal use of the Adamson Street property, the City violated the Massachusetts Zoning Act (“MZA”), G.L.c. 40A.
The MZA provides, in pertinent part, that:
Notwithstanding any general or special law to the contrary, local land use and health and safety laws, regulations, practices, ordinances, by-laws and decisions of a city or town shall not discriminate against a disabled person. Imposition of health and safety laws or land-use requirements on congregate living arrangements among nonrelated persons with disabilities that are not imposed on families and groups of similar size or other unrelated persons shall constitute discrimination. The provisions of this paragraph shall apply ... to the city of Boston. . .
G.L.c. 40A, §3. This provision was adopted by the Massachusetts legislature in 1989.
*471 Since the MZA nowhere defines the phrases “disabled person" or “persons with disabilities,” the court must look elsewhere for guidance. The City suggests that the appropriate definitional source for these phrases is the regulations promulgated by the Architectural Access Board, 521 CMR§5.58, promulgated pursuant to G.L.c. 22, §13A. That regulation defines “Persons with Disabilities” as:
individuals who experience substantial limitations in one or more major life activities, including but not limited to such functions as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working. Persons with disabilities shall include but not be limited to those who have the inability to walk, difficulty walking, hearing disabilities, lack of coordination, reaching and manipulation disabilities stamina, difficulty interpreting and reacting to sensory information and extremes in physical size.
While the residents of Granada House arguably meet this definition, in that they have experienced “substantial limitations in . . . learning and working,” the court concludes that this definition is too narrow and focused on physical disabilities for which the Architectural Access Board is responsible, to be applicable to the broad scope and purpose of the MZA.[2]
The same can be said of the City’s other suggested definitional source, which is based on a 1991 amendment to the definition of “handicapped persons of low income” in G.L.c. 121B (Housing and Urban Renewal). That statute states:
‘Handicapped person of low income,’ persons who . . . have an impairment which is expected to be of long continued and indefinite duration, which substantially impedes the ability to live independently in conventional housing. . . . Except as required by federal law, and notwithstanding any other law to the contrary, a history of alcohol or substance use shall not constitute a qualifying impairment. . .
G.L.c. 121B, §1. This definition, however, relates to a particular law which has a different scope, focus and purpose than the MZA. Moreover, by its own terms, the exclusion of persons with a history of alcohol or substance use is inapplicable where, as here, their inclusion is required by federal law, specifically the FHA.
Massachusetts has adopted the principle of statutory construction that where a state law does not define a phrase used in the law, a court should follow the construction given to the same phrase in parallel federal statutes by the federal courts. See Vasys v. Metropolitan District Commission, 387 Mass. 51, 54 (1982), where the Court held that:
When the Legislature, in enacting a statute, adopts the language of a federal statute, we will ordinarily construe the Massachusetts statute in accordance with the construction given the cognate Federal statute by the Federal courts . . . We do not follow the Federal precedent, however, when the Federal result is dictated by some principle of Federal law not found in the law of Massachusetts.
See also Framingham Clinic, Inc. v. Zoning Board of Appeals of Framingham, 382 Mass. 283, 290 (1981) (in absence of express definition, meaning of word or phrase in zoning enactment should be derived “from sources presumably known to enactors, such as their use in other legal contexts and dictionary definitions”).
As a civil rights statute, the MZA is remedial and the court must construe it liberally. Batchelder v. Allied Stores Corp., 393 Mass. 819, 822 (1985); City of Boston v. Hospital Transp. Serv., 6 Mass.App.Ct. 198, 201-02 (1978). In the present case, the court concludes that Massachusetts would look to federal law, including the FHA, in interpreting the phrases “disabled person” and “persons with disabilities," and that by so doing, the MZA must be read to bar the City’s discriminatory treatment of a group home for recovering drug and alcohol users under the Code.
Accordingly, Granada House is entitled to summary judgment on Count IV of its Amended Verified Complaint.
C. Count VI: Appeal of Zoning Board Decision
Count VI of the Amended Verified Complaint alleges that the Zoning Board’s decision to deny the variances sought by Granada House exceeded its authority, was unjust and inequitable.
As noted above, the Code does not define the phrase “persons with disabilities” as that phrase relate to the terms “Group Residence, Limited” and “Group Care Residence, General” in Article 2A of the Code. However, the meaning of words and phrases used in zoning ordinances “is a question of law . . . and is to be determined by the ordinary principles of statutory construction.” Framingham Clinic, Inc. v. Zoning Board of Appeals of Framingham, 382 Mass. at 290 (1981). Moreover, zoning ordinances should be interpreted to avoid illegality. Farmer v. Billerica, 381 Mass. 775, 776 (1980); Dollinger v. Town Clerk of Millis, 343 Mass. 10, 15 (1961).
Here, the relevant provisions of the Code were amended in 1991 specifically to bring the Code into compliance with the FHA and the MZA. As the court has already concluded that the Code must be read to include recovering alcoholics and drug addicts in the definition of “persons with disabilities” authorized by “Group Residence, Limited,” and that to exclude them from the scope of that definition would violate the FHA (see Part A, supra), it follows that the Zoning Board’s denial of the variances sought by Granada House exceeded its authority and was based on a “legally untenable ground.” See Crittenden Hastings House of the Florence Crittendon League v. Board of Appeal of Boston, 25 Mass.App.Ct. 704, 711 (1988).
*472 Accordingly, Granada House is entitled to summary judgment on Count VI of its Amended Verified Complaint.
D. Count II: Americans With Disabilities Act
The City has moved for summary judgment as to Count II of the Amended Verified Complaint, which alleges a violation of the Americans With Disabilities Act of 1973 ("ADA”), 42 U.S.C. §12101 etseq. TheADA provides that:
no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.
42 U.S.C. §12132. “Disability” is defined as “a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual.” 42 U.S.C §2102(2)(A). Persons recovering from or receiving treatment for addiction to alcohol or drugs are disabled individuals for purposes of the ADA. 42 U.S.C. §12210(b) and (c); 28 C.F.R. §§35.104, 35.131. The City asserts, however, that zoning decisions do not constitute a “service[], program[] or activity] of a public entity,” and therefore the ADA is inapplicable to the present action.
Massachusetts has not resolved the question of whether zoning decisions fall within the ambit of the ADA. The authorities elsewhere are in disagreement or are inconclusive. The court, however, finds the analysis of the court in Innovative Health Systems v. City of White Plains, 931 F.Supp. 222 (S.D.N.Y. 1996), persuasive. There, the Zoning Board of Appeals of the City of White Plains denied a proposed change of use of a building that had been sought by Innovative Health Systems (“IHS'j, a state certified treatment program for individuals with alcohol and drug dependency, in order to permit it to operate its program in downtown White Plains, New York. The court analyzed, and failed to find persuasive, the reported cases that suggested that the ADA did not apply to zoning decisions. The court relied on the plain language of the ADA, as well as its legislative history, to conclude that the zoning decisions of municipalities constitute an “activity” under the ADA.[3] Id. at 232-33. This court agrees with that analysis and concurs in the conclusion that the ADA applies to the Zoning Board’s decision in this case.
Accordingly, the City’s motion for summary judgment as to Count II of the Amended Verified Complaint must be denied.
D. Count III: Rehabilitation Act of 1973
The City has also moved for summary judgment as to Count III of the Amended Verified Complaint, which alleges a violation of the Rehabilitation Act of 1973 (“the Rehabilitation Act”), 29 U.S.C. §794, et seq.
The Rehabilitation Act provides that:
No otherwise qualified individual with a disability in the United States, as defined in Section 706(8) [29 U.S.C. §706(8)] • • • . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .
29 U.S.C. §794(a), as amended in 1992. A person recovering from or receiving treatment for addiction to alcohol or drugs is a “qualified individual with a disability” for purposes of the Rehabilitation Act. Innovative Health Systems, 931 F.Supp. at 231 (and cases cited therein); 29 U.S.C. §706(8)(B) and (C).
The Rehabilitation Act further provides that:
For the purposes of this section, the term “program or activity” means all of the operations of ... a department, agency, special purpose district, or other instrumentality of a State or of a local government . . .
29 U.S.C. §794(b)(l)(A). The ISD’s denial of the permit sought by Granada House to change the use of the Adamson Street property, and the Zoning Board’s refusal to grant any variances constitute zoning activities covered under the Rehabilitation Act. Innovative Health Systems, 931 F.Supp. at 233. The Rehabilitation Act “provides a remedy for individuals with disabilities in zoning activities.” Innovative Health Systems, 931 F.Supp. at 234.
The Rehabilitation Act applies only to discrimination by recipients of Federal financial assistance. However, there exists a sufficient nexus between The City's zoning activities and federal funding to conclude that the Rehabilitation Act is applicable to the present case. Under the Civil Rights Restoration Act, any program in an institution that receives federal financial aid, no matter how specific the purpose or program for which that aid is given, must follow the guidelines of the Rehabilitation Act. Innovative Health Systems, 931 F.Supp. at 234 (sufficient for plaintiffs to allege that the Cily is a recipient of federal financial assistance, even though there was no allegation as to the Planning Board and Zoning Board of Appeals). The City has received substantial federal funding from a variety of sources for a variety of purposes. The City’s actions, therefore, must conform to the Rehabilitation Act.
Accordingly, the City’s motion for summary judgment as to Count III of the Amended Verified Complaint must be denied.
ORDER
For the foregoing reasons, Plaintiffs Motion for Partial Summary Judgment is ALLOWED as to Counts I, IV and VI. The Defendants [sic] City of Boston Motion for Summary Judgment of [sic] Count II and III of Plaintiffs Complaint Pursuant to Mass. R.Civ.P. 56 is DENIED.

The subdistrict also allows one and two family residences, places of worship, as well as elementary and second *473 ary schools. Article 51, Section 8, Table A.

To read the this statute as excluding ex-alcohol and ex-drug addicts from the definition of persons with disabilities would, by reasonable extension, also require the exclusion of mentally ill and mentally retarded persons. It is doubtful that the Code could or should be read to permit the City to discriminate against these groups, and in any event, the Code expressly does not do so.

Webster's Third New International Dictionary (1993) defines “activity” as a “natural or normal function or operation.”